**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 18, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BILLY HAMILTON,

      Plaintiff - Appellant/Cross-Appellee,

v.

NORTHFIELD INSURANCE
COMPANY,

      Defendant - Appellee/Cross-
Appellant.

Nos. 17-7049 & 17-7055

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:16-CV-00519-RAW)**
_____

Kris Ted Ledford of Ledford Law Firm, Owasso, Oklahoma, for Plaintiff-
Appellant/Cross-Appellee.

Darrell W. Downs and Jacob R. Daniel (R. Stratton Taylor and Mark H. Ramsey with
them on the brief), of Taylor, Foster, Mallett, Downs, Ramsey & Russell, P.C.,
Claremore, Oklahoma, for Defendant-Appellee/Cross-Appellant.
_____

Before **TYMKOVICH**, Chief Judge, **McKAY**, and **CARSON**, Circuit Judges.
_____

**McKAY**, Circuit Judge.
_____

     Billy Hamilton appeals the district court's order granting summary judgment

in favor of defendant Northfield Insurance Company as to Mr. Hamilton's claim for

breach of the implied duty of good faith and fair dealing and his accompanying request for punitive damages. Mr. Hamilton also challenges the court's conclusion, following a jury verdict in his favor on his breach of contract claim, that he was not the prevailing party for purposes of attorney fees and prejudgment interest under Oklahoma statute. Lastly, anticipating remand of the bad faith claim, Mr. Hamilton argues the court erred in prohibiting certain cross-examination of Northfield's expert witnesses. Northfield, in turn, cross-appeals the court's denial of its motion for judgment as a matter of law as to Mr. Hamilton's breach of contract claim. The insurance company also challenges the court's rulings on Mr. Hamilton's expert witness report and testimony. For the following reasons, we affirm.[1]

## I.

In March 2015, Mr. Hamilton purchased a Northfield insurance policy for a commercial building in Council Hill, Oklahoma. Northfield had a third party inspect the property for underwriting purposes in May. The underwriting survey report concluded the risk was "Satisfactory with Recommendation Compliance" and identified eight recommendations, including that potholes be filled, graffiti be removed, and a broken window be repaired. (Appellant's App. at 249.) The insurance policy included a limitation for:

> The interior of any building or structure, or to personal
> property in the building or structure, caused by or resulting

---

[1] Because we affirm the district court's order granting summary judgment on Mr. Hamilton's bad faith and punitive damages claim, we do not address his argument regarding the cross-examination of Northfield's expert witnesses, which would only be relevant on retrial.

2

from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(*Id.* at 173.)

Mr. Hamilton's tenant informed him the roof was leaking in June 2015. Because Mr. Hamilton had some experience installing and repairing metal roofs, he inspected the roof himself, noticing that he "could feel the metal moving because of numerous loose screws which were sticking up from the metal roofing." (*Id.* at 308.) Mr. Hamilton and his brothers tightened the loose screws, coated any screws that would not tighten with tar and installed new screws near these screws, and applied another coat of tar at a transition point on the roof where it appeared to be leaking. A few months later, the tenant again notified Mr. Hamilton the roof was leaking, and Mr. Hamilton again made the same efforts to repair the leak. Finally, after the tenant informed him the roof was leaking in December 2015, Mr. Hamilton reported the leak and the resulting interior damage to Northfield.

Mr. Hamilton's claim was assigned to a Northfield claims adjuster. The claims adjuster contacted Mr. Hamilton, who told him about the roof and his attempted repairs. The claims adjuster did not "ask him about the type of repairs he tried to make" or keep a record of what repairs Mr. Hamilton said he had made. (*Id.* at 205.) That same month, a field adjuster went to the property to take photographs

3

and collect data for submission to the claims adjuster. The field adjuster found "an opening in the exterior of [the] building which would allow water in" at the transition point on the roof and determined that was where the water had entered. (*Id.* at 390-93.) The parties dispute whether the field adjuster knew Mr. Hamilton had applied tar to the roof earlier that year.

The claims adjuster concluded that the damage was not covered under the insurance policy because "[v]isibly [they] could not see any wind damage." (*Id.* at 206.) In February 2016, the claims adjuster sent Mr. Hamilton a letter informing him that Northfield was denying his claim. The letter stated Northfield had made this decision because "there was no evidence of any openings caused by storm damage" and the policy did not cover damage caused by "[w]ear and tear"; "corrosion, decay, [or] deterioration"; "cracking, shrinking[,] or expansion"; or "faulty[,] inadequate[,] or defective . . . workmanship[ or] repair, . . . [, m]aterials used in repair, construction, renovation[,] or remodeling[, or m]aintenance." (*Id.* at 208, 210.) The letter also noted that Northfield's position was based on "the information presently available" and invited Mr. Hamilton to send Northfield further information he considered relevant. (*Id.* at 210.)

One week later, Northfield sent Mr. Hamilton a letter notifying him that it would not renew his policy when it expired the following month. The notice identified the reason for nonrenewal as "Underwriting Guidelines." (*Id.* at 501.) According to Mr. Hamilton, Northfield told him the nonrenewal decision had come from a third party. Northfield's response to one of Mr. Hamilton's requests for

4

production also stated, "The decision to nonrenew the Plaintiff's policy was made by Graham Rogers, Inc.[, which] . . . was the underwriting agent for the subject insurance policy." (*Id.* at 506.) During a deposition, however, a Graham Rogers employee stated Northfield had made the nonrenewal decision. Internal Northfield emails from February 2016 also indicate a Northfield employee suggested nonrenewal upon noting Mr. Hamilton's insurance claim and a lack of information regarding his fulfillment of the underwriting recommendations.

After Northfield denied the claim, Mr. Hamilton contacted a roofer, Bernie Akles, to obtain his opinion regarding the cause of the leaking roof. When Mr. Akles inspected the roof, he found that he "was able to move some of the metal panels up and down with [his] hand." (*Id.* at 435.) Based on his experience as a roofer, his inspection of the roof, and Mr. Hamilton's explanation of his repair efforts, Mr. Akles "determined that wind had caused the damage." (*Id.*) He stated he could "easily see that wind had caused the screws holding the metal roofing to raise" and "[w]ind whipping across the roof in an uneven up and down direction (like the way wind causes a flag to move) overstressed the tar at the high-to-low transition causing an opening at the tar which allowed rainwater to enter the building." (*Id.* at 435-36.)

Mr. Hamilton informed Northfield of Mr. Akles' opinion in March 2016, prompting Northfield to ask for a letter from the roofer. Mr. Hamilton then sent Northfield a letter from Mr. Akles' roofing company, which stated, "Upon inspection of the roof there is evidence of extreme winds stripping screws up from the decking up to 3/4" and more allowing water to come through damaging many areas in the

5

building." (*Id.* at 437.) The claims adjuster forwarded this letter to someone else at Northfield, who agreed "that it is not likely that wind would lift the roof and set back down with screws intact and no other damages present," "but also agreed that given the size of the roof and the potential size of the claim, an engineer opinion [wa]s warranted." (*Id.* at 428.)

At that point, Northfield retained Rimkus Consulting Group, Inc., "to determine if wind damage to the roofing had occurred, and if so, the extent of that damage, from storms reportedly occurring in the month of December 2015." (*Id.* at 215.) A Rimkus engineer, inspected the roof with Mr. Hamilton and Mr. Akles present. Based on his inspection, the engineer concluded "[w]ind did not cause damage to the metal roofing or its attachments" and "[t]he water intrusion is from a failed sealant joint in the roofing at the high-to-low roofing connection." (*Id.* at 216.) In April 2016, Northfield sent Mr. Hamilton a second notice informing him it was denying his claim because the engineer's inspection indicated the roof leak was caused by "lack of or deferred maintenance." (*Id.* at 499.)

In November 2016, Mr. Hamilton sued Northfield in Oklahoma state court, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Northfield removed the case to federal court. In May 2017, Northfield filed a motion to strike Mr. Akles' expert report or in the alternative to preclude his testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The district court denied both requests. Northfield also filed a motion for summary

6

judgment, which the court granted as to bad faith and punitive damages but denied as to breach of contract.

Mr. Hamilton's attorney sent Northfield's attorneys an email including a revised draft pretrial order in June 2017. In that communication, Mr. Hamilton's counsel asked Northfield's attorneys to send him "a serious settlement offer" the following week, noting that he had "almost $12k in hard costs invested in this case thus far" and was conveying that information "because that figure impacts how much of any settlement Mr. Hamilton would receive." (*Id.* at 938.) Counsel for Northfield responded that the insurance company was "willing to offer $45,000 to settle this case," observing that they "believe[d] this [wa]s a fair offer as it [wa]s more than three times the actual damages in this case." (*Id.* at 939.) Northfield's counsel also stated, "Based upon your out of pocket litigation expenses, this settlement amount will allow you to recover these expenses along with some fees and should reimburse Mr. Hamilton for the entire amount of his repair costs." (*Id.*)

Mr. Hamilton rejected Northfield's settlement offer, and the case proceeded to trial, resulting in a $10,652 jury verdict, the maximum amount of damages the judge instructed the jury it could award. Mr. Hamilton subsequently filed motions for attorney fees and statutory interest pursuant to Okla. Stat. tit. 36, § 3629. Northfield responded that Mr. Hamilton was not the prevailing party under the statute given that he had recovered less than the settlement offer. The district court agreed with Northfield, rejecting Mr. Hamilton's arguments for adding attorney fees to the

7

verdict when determining the prevailing party. Mr. Hamilton appealed, and Northfield filed a cross-appeal.

## II.

On appeal, Mr. Hamilton first argues the district court erred in granting summary judgment on his bad faith claim. We review summary judgment rulings de novo. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* As we stated in *Willis v. Midland Risk Insurance Co.*, for bad faith claims under Oklahoma law, "[t]he decisive question is whether the insurer had a good faith belief, at the time its performance was requested, that there was a justifiable reason for withholding payment under the policy." 42 F.3d 607, 611-12 (10th Cir. 1994). "If the insurer fails to conduct an adequate investigation of a claim, its belief that the claim is insufficient may not be reasonable." *Id.* at 612.

Mr. Hamilton rests his bad faith claim primarily on the assertion that Northfield's investigation was inadequate because the insurance company "intentionally chose not to consider undisputed facts favorable to a finding of coverage." (Appellant's Br. at 36.) He cites as evidence of inadequate investigation the May 2015 underwriting inspection finding no evidence of roof leakage; his assertion that he informed the claims adjuster and field adjuster about his repair efforts; the claims adjuster's failure to record his statements about those repair efforts; the claims adjuster's lack of training or experience installing metal roofs;

8

Northfield's failure to consider Mr. Akles' opinion or to interview him; and various aspects of Northfield's decision to hire Rimkus to conduct the second inspection of the roof, including the Rimkus engineer's qualifications and the information on which he relied. Mr. Hamilton additionally identifies as evidence of bad faith Northfield's decision not to renew the insurance policy and statement that Graham Rogers had made that decision.

Mr. Hamilton argues this evidence establishes that, "[a]t a minimum, different inferences may be drawn regarding the reasonableness of Northfield's conduct." (*Id.*) For support, he cites to the Oklahoma Supreme Court's statement in *Conti v. Republic Underwriters Insurance Co.* that "[i]f there is conflicting evidence as to the reasonableness of the insurer's actions from which different inferences may be drawn, 'then what is reasonable is *always* a question to be determined by the trier of fact by a consideration of the circumstances in each case.'" 782 P.2d 1357, 1360-61 (Okla. 1989) (emphasis in original) (quoting *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981)). The court in *Conti*, however, went on to conclude that the trial court had erred in submitting the plaintiff's bad faith and punitive damages claim to the jury because there was sufficient evidence of arson to "demonstrate that the appellant's actions in withholding payment on the claim were reasonable," despite the "legitimate dispute with respect to who was responsible for the arson." *Id.* at 1362.

Similarly, in *Sims v. Great American Life Insurance Co.*, another case upon which Mr. Hamilton relies, we acknowledged that Oklahoma law provides that the

9

question of reasonableness must be submitted to the jury when different inferences could be drawn regarding whether the insurer's actions were reasonable. 469 F.3d 870, 891 (10th Cir. 2006). Nevertheless, in *Sims*, we also concluded there was a legitimate dispute as to coverage given evidence indicating the insured's death was a suicide rather than an accident. 469 F.3d at 891-92. Moreover, we rejected the plaintiff's argument that the insurance company's investigation was inadequate because it had not further questioned family members regarding the insured's motive to commit suicide given that "the missing persons report, the death certificate, the medical examiner's report, and the accident report" all indicated suicide was the insured's cause of death. *Id.* at 892-93. Because the insurer could "reasonably rely on such evidence when making its preliminary decision to dispute coverage," we held that the district court erred in submitting the question of reasonableness to the jury: in light of the legitimate dispute as to coverage and the adequacy of the insurer's investigation, the plaintiff had not presented sufficient evidence of bad faith to survive a motion for judgment as a matter of law. *Id.*

Viewing the evidence in the light most favorable to Mr. Hamilton, Northfield still had an objectively reasonable basis to deny coverage. That the roof was apparently not leaking in May 2015 does not mean it must have started leaking due to wind as opposed to insufficient maintenance. As for Mr. Hamilton's repair efforts, the claims adjuster said during his deposition that Northfield did not instruct its adjustors to record the statements of insureds and that Mr. Hamilton's 2015 repair efforts were not particularly relevant to whether the leak had initially been caused by

10

insufficient maintenance because at that point "he was trying to fix an existing problem." (Appellant's App. at 332-33, 359.) The claims adjuster also testified that roofing contractors, like Mr. Akles, often "aren't well versed in structural analysis in determining causation." (*Id.* at 368.) Additionally, we note that the letter Mr. Akles' company sent to Northfield contained merely one sentence stating that inspection of the roof indicated that it had been damaged by "extreme winds" stripping the screws, and, as Northfield points out, the letter prompted the insurance company to hire an independent engineer to inspect the roof. (*Id.* at 437.)

Nor are we persuaded by Mr. Hamilton's criticisms of Rimkus and its engineer. The Rimkus engineer was a licensed professional engineer with a degree in civil engineering. Mr. Hamilton presents no legal authority to support his argument that these qualifications were insufficient to permit Northfield to rely on the engineer's opinion, and we are not persuaded that Northfield's reliance on the Rimkus engineer was unreasonable here. Neither Mr. Hamilton's characterization of the engineer's conclusions as "inexplicable" (Appellant's Br. at 34), nor the location or timeline of the wind data he used, makes the report unusable to establish "an objectively reasonable basis for denying the insured's claim," *State Farm Fire & Cas. Co. v. Barton*, 897 F.2d 729, 731 (4th Cir. 1990).

Mr. Hamilton also argues the investigation was inadequate because the engineer had not been informed about his repair efforts and later admitted in a deposition that "some kind of maintenance record" regarding the sealant could have been important if it were "reasonable and in close proximity to the time" of the leak.

11

(Appellant's App. at 460.)  As in *Sims*, there may have been additional actions Northfield could have taken, but Mr. Hamilton's criticisms do not rise to the level of indicating Northfield "conducted a superficial investigation."  469 F.3d at 893. Northfield sent the field adjuster and the Rimkus engineer to Mr. Hamilton's property to inspect the roof, and both investigations resulted in the conclusion that the fifteen-year-old roof had not been well-maintained.  "[A]n insurance company need not follow up on every possible lead or piece of evidence in a claim investigation to avoid liability for bad faith."  *Barton*, 897 F.2d at 732.  The record simply does not support an inference that Northfield "had no objectively reasonable basis for denying [Mr. Hamilton]'s claim and that it acted in willful or reckless disregard of [Mr. Hamilton]'s rights."  *Id.* at 731.

Finally, although the circumstances surrounding Northfield's decision not to renew Mr. Hamilton's insurance policy appear questionable, they are insufficient to give rise to a cause of action for bad faith denial of the insurance claim given Northfield's objectively reasonable basis for denying it.  We thus affirm the district court's entry of summary judgment on Mr. Hamilton's bad faith claim and on his accompanying request for punitive damages.  *See Sims*, 469 F.3d at 893.

## III.

Next, Mr. Hamilton argues the district court incorrectly determined he was not the prevailing party on his breach of contract claim pursuant to Okla. Stat. tit. 36, § 3629.  That statute provides, "Upon a judgment rendered to either party, costs and attorney fees shall be allowable to the prevailing party.  For purposes of this section,

12

the prevailing party is the insurer in those cases where judgment does not exceed written offer of settlement." § 3629(B). The statute additionally states, "If the insured is the prevailing party, the court in rendering judgment shall add interest on the verdict at the rate of fifteen percent (15%) per year from the date the loss was payable." § 3629(B). Mr. Hamilton argues he was entitled to attorney fees and interest under this section. Whether he was the "prevailing party" under the statute is a question of law we review de novo. *See Driver Music Co., Inc. v. Commercial Union Ins. Cos.*, 94 F.3d 1428, 1432 (10th Cir. 1996).

Mr. Hamilton asserts that "if an offer contemplates a plaintiff's costs and fees[,] then the costs and fees incurred by the plaintiff up to the time of the offer should be included in deciding who the prevailing party is." (Appellant's Br. at 43.) In support, he cites our decision in *Oulds v. Principal Mutual Life Insurance Co.*, 6 F.3d 1431 (10th Cir. 1993). In that case, the insurance company had offered to reinstate the plaintiff's health insurance and pay all of her currently pending health-related expenses going back to her effective date of coverage. *Id.* at 1445. The insurer argued the plaintiff was not entitled to recover attorney fees under § 3629(B) because the judgment she won at trial did not exceed this amount. *Id.* at 1445-46. The plaintiff, in turn, asserted "that her recovery by way of the judgment exceeds the amount of the settlement offer when attorneys' fees, costs, and interest are added to the judgment," citing to *Carson v. Specialized Concrete, Inc.*, 801 P.2d 691 (Okla. 1990). *Oulds*, 6 F.3d at 1446. We observed that in *Carson*, "the court, construing a statute similar to Section 3629, held that if an offer of settlement includes costs and

13

fees, the trial court must calculate the amount of costs and fees incurred by the plaintiff up to the time of the offer in deciding who has prevailed." *Id.* Nevertheless, we found *Carson* distinguishable because in *Oulds* the insurer's offer "did not include costs and fees." *Id.*

In *Carson*, the plaintiffs won all of their damages at trial, but that amount was slightly less than the offer of judgment, which was "inclusive of all interest, costs, and attorney fees." 801 P.2d at 692. The Oklahoma Supreme Court identified the issue in that case as whether, under the relevant offer-of-judgment statute, "the trial court must consider the amount of the costs and attorney fees when determining if a jury verdict is lesser or greater than the amount of an offer which includes costs and attorney fees." *Id.* The court concluded that, under the defendant's theory, "a defendant c[ould] thwart the legislative intent of [the statute] by offering an amount that is more than the amount claimed but less than the recovery plus the total taxable court cost." *Id.* at 693. The court stated, "The Legislature did not intend for this loophole to exist." *Id.* Accordingly, the court found the plaintiffs entitled to attorney fees under the statute once costs were added to the verdict. *Id.*

Northfield asserts that our *Carson* discussion in *Oulds* was dicta and the *Carson* rule should not be applied in the § 3629 context because that statute pertains to offers of settlement whereas the statute at issue in *Carson* pertained to offers of judgment. In support, Northfield cites *Allison v. City of El Reno*, in which the court determined that the plaintiffs became the prevailing parties entitled to costs and attorney fees upon accepting the defendant's offer of judgment, which did not include

14

those items. 894 P.2d 1133, 1135, 1137 (Okla. Civ. App. 1994). Similarly, in *Fluharty v. Speedy Wrecker Service, Inc.*, the court affirmed the trial court's award of attorney fees to the plaintiffs upon their acceptance of the defendant's offer of judgment. 748 P.2d 49, 50-51 (Okla. Civ. App. 1987). The court remarked, "Unless Defendant's offer, as accepted by Plaintiff, contains some agreement relating to attorney's fees, one way or another, then [the attorney fee provision] will apply, since Plaintiff is prevailing party." *Id.* at 51.

We are persuaded that there is a meaningful distinction between an offer of settlement and an offer of judgment. A "judgment" is "[a] court's final determination of the rights and obligations of the parties in a case." *Judgment*, Black's Law Dictionary (10th ed. 2014). A "settlement," on the other hand, is "[a]n agreement ending a dispute or lawsuit." *Settlement*, Black's Law Dictionary (10th ed. 2014). Indeed, we have previously stated, in a case involving statutory entitlement to attorney fees under Oklahoma law, that "unlike a confession of judgment, an out-of-court settlement does not involve a final judicial determination on the merits." *Howell Petroleum Corp. v. Samson Res. Co.*, 903 F.2d 778, 783-84 (10th Cir. 1990). We concluded that, "under Oklahoma law, a final judgment is a prerequisite to being a prevailing party," and although a confession of judgment is sufficient, an out-of-court settlement is not. *Id.*

In the offer-of-judgment context, whether an offer contemplates costs and attorney fees is crucial. An offer that does not include these items allows the plaintiff to petition the court for their award as the prevailing party under the applicable

15

statute. *See, e.g., Allison*, 894 P.2d at 1135, 1137; *Fluharty*, 748 P.2d at 50-51. A settlement offer, however, does not create this possibility because a plaintiff who agrees to settle the case is not the prevailing party. In fact, when a case settles, there is no prevailing party; the case is simply dismissed. *See Howell Petroleum*, 903 F.3d at 783-84. Thus, when considering settlement offers, it would not make sense to require a defendant to specify whether the offer contemplated costs and fees, because if the plaintiff accepts the offer the case will terminate and the settlement amount is all the recovery the plaintiff will obtain. Section 3629(B) clearly states that the insurer is to "submit a written offer of settlement." Unlike the offer-of-judgment statutes at issue in *Carson*, *Allison*, and *Fluharty*, § 3629 does not direct the court to enter judgment upon the acceptance of an offer.

Mr. Hamilton asserts that not adding costs and fees to a verdict when determining the prevailing party would "allow insurance companies to deny claims thereby forcing their insureds to hire attorneys to file lawsuits and then avoid paying their insured's attorney fees by making a settlement offer just one dollar more than their contractual damages on the eve of trial." (Appellant's Br. at 41-42.) As appealing as that argument may sound, applying the *Carson* rule to the § 3629 context would not prevent that from occurring. Under *Carson*, costs and attorney fees are only added to the verdict when the offer contemplated those items. Thus, an insurer could avoid paying costs and attorney fees simply by making that "one dollar more" settlement offer and specifying it did not include costs and attorney fees. Because § 3629 is an offer-of-settlement rather than an offer-of-judgment statute, an

16

offer made and accepted under that provision does not entitle the plaintiff to seek attorney fees afterward. *Cf. Henrie v. Northrop Grumman Corp.*, 502 F.3d 1228, 1235 (10th Cir. 2007) ("It is not our role to rewrite the . . . statute.").

As we recently observed, "'we are generally reticent to expand state law without clear guidance from the state's highest court' for it is not a federal court's place to 'expand state law beyond the bounds set by the highest court of the state.'" *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 948 (10th Cir. 2018) (brackets and ellipsis omitted) (quoting *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1295 (10th Cir. 2017)). Mr. Hamilton has identified no Oklahoma case, nor are we aware of any, applying the *Carson* rule outside the offer-of-judgment context. To the extent *Oulds* suggested *Carson* would apply to § 3629(B), we note that such language was dicta and we are not bound to follow it. *See Tokoph v. United States*, 774 F.3d 1300, 1303 (10th Cir. 2014) ("[W]e are bound by holdings, not dicta."). The proper comparison when deciding whether Mr. Hamilton was the prevailing party was between Northfield's $45,000 settlement offer and Mr. Hamilton's $10,652 jury verdict. Those figures clearly establish that Mr. Hamilton was not the prevailing party and the district court was correct to deny his requests for attorney fees and prejudgment interest.

## IV.

In its cross-appeal, Northfield first argues the district court erred in denying its motion for judgment as a matter of law. Northfield initially made this motion at the close of Mr. Hamilton's evidence. Then, after Northfield rested its case, the judge

17

asked Northfield's counsel, "Renew your Rule 50 motion[?]" (Appellant's App. at 1466.) Counsel responded "Yes," then formally "move[d] for judgment as a matter of law or on a directed verdict with respect to plaintiff's claims in this case." (*Id.*) The court denied this motion and submitted the case to the jury, which entered judgment in favor of Mr. Hamilton. Northfield did not file a Rule 50(b) or a Rule 59 motion at any time within (or after) the 28-day window following the entry of judgment that those rules create. *See* Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59. Because of this, Mr. Hamilton argues Northfield waived the opportunity to challenge the sufficiency of the evidence presented at trial, citing to *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), and *Home Loan Investment Co. v. St. Paul Mercury Insurance Co.*, 827 F.3d 1256 (10th Cir. 2016).

Rule 50(a) states, "If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law," which "may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a). In turn, Rule 50(b), which is entitled "RENEWING THE MOTION AFTER TRIAL; ALTERNATIVE MOTION FOR A NEW TRIAL," provides: If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury, [and] . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59" "[n]o later than 28 days after the entry of judgment." Fed. R. Civ. P. 50(b).

18

Rule 50 previously required the initial motion to be made "at the close of all of the evidence." *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008). The 2006 amendment to the rule, however, now permits "renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence," so that any preverdict Rule 50(a) motion can be relied upon in a subsequent Rule 50(b) motion. Fed. R. Civ. P. 50, advisory committee notes. The advisory committee specifically noted that courts had already "begun to move away from requiring a motion for judgment as a matter of law at the literal close of all the evidence." *Id.* The committee also observed, "Many judges expressly invite motions at the close of all the evidence. The amendment is not intended to discourage this useful practice." *Id.*

Northfield argues it "made a Rule 50(b) motion renewing its sufficiency of the evidence ruling, at the behest of the district court, and thus did not waive its ability to appeal this issue." (Appellee's Reply Br. at 18.) The district court did not, however, invite Northfield to submit a Rule 50*(b)* motion at the close of the evidence, but rather to renew the earlier Rule 50 motion before the case was submitted to the jury. Nothing in the record suggests the district court believed the subsequent Rule 50 motion was a renewal under Rule 50(b)—the rule applicable to motions renewed "after trial"—as opposed to another chance for Northfield to make its case for judgment as a matter of law under Rule 50(a), as many trial judges invite. Nor has Northfield identified any authority for an appellate court to consider a preverdict Rule 50 motion as a Rule 50(b) motion. In fact, controlling Supreme Court and

19

Tenth Circuit precedent indicate otherwise. *See Unitherm Food Sys., Inc.*, 546 U.S. at 407 ("[S]ince respondent failed to renew its preverdict motion as specified in Rule 50(b), there was no basis for review of respondent's sufficiency of the evidence challenge in the Court of Appeals."); *Home Loan Inv. Co.*, 827 F.3d at 1269 ("[A] failure to renew a sufficiency-of-the-evidence claim in a postverdict Rule 50(b) motion deprives the appellate court of power to review the sufficiency of the evidence at trial."). We therefore do not consider Northfield's Rule 50 argument.

**V.**

Finally, Northfield argues the district court erred in denying its motion to strike Mr. Akles' expert report or in the alternative to preclude his testimony under *Daubert*. Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure provides that the disclosure of an expert witness "must be accompanied by a written report—prepared and signed by the witness." That rule also states that the report must include:

> **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> **(ii)** the facts or data considered by the witness in forming them;
>
> **(iii)** any exhibits that will be used to summarize or support them;
>
> **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> **(v)** a list of all other cases in which, during the previous 4 years, the witness testified at trial or by deposition; and
>
> **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

20

Fed. R. Civ. P. 26(a)(2)(B).

"'The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court.'" *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). We have previously stated that in deciding this issue district courts should consider: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.* Additionally, there is no requirement for a district court to make explicit findings here. *Id.*

Northfield claims it was prejudiced by Mr. Akles' report "because there was nothing to verify [Mr.] Akles' conclusory opinions and the presence of his report created a fact question on the Appellant's breach of contract claim." (Appellee's Br. at 44.) Assuming arguendo that Mr. Akles' expert report was insufficient under Rule 26, we are not persuaded the district court abused its discretion in denying Northfield's motion to strike. Northfield has not identified any authority in support of its claimed "prejudice." The expert witness disclosure requirements are intended to give "opposing parties . . . a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Rule 26, advisory committee notes. Northfield has not argued Mr. Akles' expert report prevented the insurance company from preparing its defense to his testimony, and we do not find the fact that the case went to trial a valid claim of prejudice here.

21

Without any prejudice, there was no need to cure it and no disruption of trial by introducing Mr. Akles' opinion. Moreover, Northfield does not suggest Mr. Hamilton acted in bad faith or willfully.

Lastly, Northfield asserts Mr. Akles' testimony did not meet the expert witness requirements of Rule 702 of the Federal Rules of Evidence as set forth in *Daubert*, 509 U.S. 579. "'We must afford *substantial deference* to the district court's application of *Daubert*.'" *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1216 (10th Cir. 2016) (emphasis in original) (quoting *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002)). "A court abuses its discretion when its ruling is 'arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Id.* (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)).

An expert witness may testify under Rule 702 if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Northfield asserts, "There must be a principle, standard, or objective explanation of methodology to explain the meaning of [Mr.] Akles'

22

observations. None were listed in his report. There was no indication of how [Mr.] Akles collected data, what data was used, or how he derived his opinions from that data." (Appellee's Br. at 48 (footnote omitted).) Northfield also briefly challenges, in a single footnote, Mr. Akles' qualifications as an expert witness.

We first address whether the district court properly concluded Mr. Akles was qualified to give expert testimony here. Northfield claims Mr. "Akles may not even be qualified as an expert, as he installs roofs and has no qualification in the causation of damage to a structure." (*Id.*) In support, Northfield cites *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991), in which we observed that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications" so long as he "stay[s] within the reasonable confines of his subject area and [does not] render expert opinions on an entirely different field or discipline." We conclude here that Mr. Akles' experience as a roofer qualified him to give his opinion as to the cause of damage to a roof.

As for whether Mr. Akles' opinion was based on a reliable methodology, the district court noted that Mr. Akles' theory for the leak was clear and "provide[d] a reason to disbelieve the counter-theory that the screws were over-torqued at the time of installation, i.e., 'No dimpling on the metal around the screw.'" (Appellant's App. at 640.) The court concluded, "To put the matter in colloquial terms, this is 'not brain surgery.' The proffered opinion passes muster, but may of course be subjected to cross-examination as to its weight." (*Id.*) As Mr. Hamilton states, "Mr. Akles' opinions are based on his almost four decades of experience as a roofer, his personal

23

observations having inspected Mr. Hamilton's roof, and consideration of the undisputed facts of Mr. Hamilton's prior repair efforts." (Appellant's Reply Br. at 47.) In the context of this case, we cannot say the district court abused its discretion in concluding Mr. Akles' personal inspection of the roof and evaluation of the cause of the leak based on his experience formed a sufficient methodology for him to provide expert testimony.

## VI.

For all of the foregoing reasons, the district court's rulings in this case are **AFFIRMED**. Additionally, Mr. Hamilton's unopposed motion to seal volume 9 of the appendix is **GRANTED**.